**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

v.                                                      CASE NO: 3:13-cr-52-J-34MCR

EDGAR MORING
_____/

**ORDER ON COMPETENCY**

**THIS CAUSE** is before the Court on the issue of Defendant's competency to

stand trial.  The Court has considered the Competency Evaluation Report of Dr. Alan J.

Harris, Ph.D. dated April 23, 2013; the Competency Evaluation of Dr. Jerry Valente

dated March 6, 2013; as well as the testimony and evidence presented at the two

evidentiary hearings held on April 29 and May 29, 2013.  For the reasons set forth

below, the Court concludes that Defendant is competent to participate in all pretrial

proceedings and to stand trial.

## I.    BACKGROUND

On March 14, 2013, an Indictment was returned charging Defendant with one

count of possession of a firearm by a convicted felon.  (Doc. 1).  On March 20, 2013,

the Government made an oral motion seeking a competency evaluation of Defendant.

(Doc. 18).  On March 26, 2013, the undersigned granted the motion and appointed Dr.

Alan J. Harris to conduct an examination of Defendant in order to determine his

competency to stand trial.  (Doc. 19).  Defendant was examined on April 11, 2013.

On April 29, 2013, a competency hearing was held before the undersigned and

the Government presented Dr. Harris's report indicating Defendant was competent to

stand trial.  (Gov. Ex. 1, 4/29/2013 hearing).  Dr. Harris testified he reviewed the thirteen

prior competency evaluations performed on Defendant, records regarding Defendant's various criminal charges, and an audio recording of an interview of Defendant on February 4, 2013 by a special agent with the ATF.  Dr. Harris observed that during his evaluation, Defendant appeared very impaired.  His speech was unusual, he seemed confused, he had a very hard time expressing himself, and went off on tangents. Defendant stated he had visual hallucinations and was paranoid.  Defendant's ability to express himself improved when Dr. Harris began administering tests.

Dr. Harris administered five tests to assess Defendant's honesty and willingness to put forth full effort in responding to questions.  All five of these tests indicated Defendant was exaggerating his symptoms and was malingering.  For example, Dr. Harris explained that the first test, the Rey 15 Items Memory Test, is designed to assess the validity of memory complaints.  Although the test appears difficult, it is a very simple test and mildly mentally retarded individuals average a score of 9.9.  Defendant scored a 5, which Dr. Harris stated is extraordinarily low and strong evidence of suboptimum effort.

The next test Dr. Harris administered was the Hiscock and Hiscock Symptom Validity Test, which is another simple test where any result below 90 percent is suspect. The test is a forced choice test where the individual must choose between two possible answers.  Even brain damaged individuals perform close to perfect.  The test is set up in three trials and the individual is told that each trial is getting more and more difficult; however, in reality, the test is the same level of difficulty throughout.  During the first test, Defendant answered 55 percent correctly.  After being informed that the next section was more difficult, Defendant answered only 45 percent correctly.  Dr. Harris

indicated these results were essentially equal to chance.  Defendant could have guessed the correct answer and received the same results.  For the third section, Defendant was told it would be the most difficult and scored only 30 percent.  This result indicated to Dr. Harris that Defendant knew the correct answers, but intentionally chose the incorrect answer.

The next test, the Forced Choice Competency Questionnaire, is another simple forced choice test.  On the first part, orientation, Defendant answered only 37.5 percent correctly and indicated the year was 2012, even though he had previously answered correctly that it was 2013.  The second part tested general knowledge and Defendant only answered eleven percent correctly, which Dr. Harris explained meant he knew the correct answer and chose the incorrect answer.  As for the legal knowledge section, Defendant answered only 19 percent correctly, again indicating he intentionally chose the incorrect answer.

The next test was the Inventory of Legal Knowledge test.  Again, it is a forced choice test.  Individuals with absolutely no knowledge of the legal system are still able to answer approximately half of the questions correctly.  The cut-off score for honest responses is 47.  Defendant scored 21, again showing he intentionally chose incorrect responses.

The final test, the Miller Forensic Assessment Symptoms Test, is designed to assess feigning.  It asks questions regarding potential symptoms.  The average person who is genuinely psychotic generally scores a 1, 2, or 3.  If someone scores a 6, it is considered likely that the person is feigning.  In clinical samples, a score of 11 indicated feigning with zero false positives (indicating that every person receiving that score was

indeed feigning).  Defendant scored a 17, which Dr. Harris stated was strongly indicative of malingering.  Further, Defendant endorsed strange symptoms and combinations of symptoms that are highly unlikely.

Dr. Harris further testified that none of the prior examiners conducted validity tests to determine whether Defendant was putting forth appropriate effort or malingering.  Additionally, Dr. Harris noted that during the interview with the ATF agent, eight days prior to Dr. Harris's evaluation, there was a dramatic difference in Defendant's presentation and his way of speaking.  Defendant was able to speak fluently, coherently, and relevantly.  Defendant had good recall, including dates.  Additionally, his memory appeared to be good, which was quite different from the test results.

Dr. Harris stated that he believed Defendant had a mental disease or defect in that he suffers from an alcohol problem and mild mental retardation.  Additionally, Defendant's intelligence is below average.  However, Dr. Harris testified that these conditions were not of such a severity as to make him incompetent to understand the nature of the proceedings, to understand the consequences, or to assist his attorney.  Dr. Harris believed Defendant knew enough about the system to understand the benefits of appearing grossly impaired.

During the hearing, counsel for Defendant asked if the hearing could be continued so that he could meet with one of the other doctors who had evaluated Defendant.  The Court scheduled a continuation of the hearing for May 29, 2013.

On May 29, 2013, Defendant presented Dr. Jerry Valente, a forensic psychologist who performed evaluations of Defendant on January 26, 2013 and

February 2, 2013.  (See Defendant's Ex. 1, 5/29/2013 hearing).  Dr. Valente testified he

performed an IQ test on Defendant and found he had a full scale IQ of 53.  Although this

finding would indicate an individual who was profoundly mentally retarded, Dr. Valente

testified he believed the result was depressed and that Defendant was only mildly

mentally retarded.  Dr. Valente also evaluated Defendant to determine whether he was

competent to stand trial.  Dr. Valente determined Defendant was not competent.  (See

Defendant's Ex. 1, 5/29/2013 hearing).

       During cross-examination, the Government played several audio recordings of

Defendant.  The first was a recording of an interview of Defendant by an agent with the

ATF.  (Government's Ex. 2, 5/29/2013 hearing).  The interview was conducted on

February 4, 2013, just two days after Dr. Valente's second day of evaluating Defendant.

During the interview, Defendant described and named the individual from whom he

purchased the gun at issue in this case.  Id.  Additionally, Defendant was able to explain

that he negotiated the price of the gun down from $80 to $50 and stated that he planned

to use it to shoot squirrels.  Id.

       The Government asked Dr. Valente if he believed Defendant's behavior during

the interview was consistent with the behavior Dr. Valente observed during the

evaluation.  Dr. Valente stated that it was not.  Specifically, Dr. Valente explained that

the interview was much more productive, detailed, and contained logical sequencing.

Defendant even referenced memories and was able to give an accounting of his

activities.  Dr. Valente noted that Defendant did none of these things during the

evaluation just two days prior, despite the fact that Dr. Valente specifically inquired into

Defendant's activities leading to his arrest.

Next, the Government played several recordings of telephone calls placed by Defendant from jail to members of his family.  During the phone calls, Defendant named his attorney, indicated he understood the difference between a private attorney and a public defender, and was able to recall advice given by his attorney.  Additionally, Defendant stated that he believed he was facing a sentence of two years, but that because he had already served five months, his sentence would be less.  Defendant wanted to know how much money was left in his account and was budgeting how much he could spend to make it last for a year.  Finally, Defendant indicated he understood that he might be sent to a mental hospital in North Carolina for mental treatment and evaluation.

Dr. Valente testified that during his evaluation of Defendant two days earlier, Defendant was not able to name his attorney when asked.   He also testified that Defendant was not able to demonstrate knowledge of the difference between a public defender and a private attorney, nor did he demonstrate any knowledge of the amount of time he was facing or the amount of time he had already served.  Defendant also did not know what charge he was facing.

When asked if any of the recordings had an impact on his prior finding of incompetence, Dr. Valente said "yes."  He explained that the recordings carry more weight than the discussions he had with Defendant because any time Defendant spoke with a doctor, he had an interest in the outcome.  Defendant would perform to the audience.  When he was speaking with his family, Defendant had no such interest. Dr. Valente admitted that Defendant's behavior during the interview and the phone calls was consistent with malingering.

## II.     ANALYSIS

Title 18, United States Code, Section 4241(a), provides that the Court shall order a hearing regarding a defendant's competency to stand trial "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  The Court has the authority to order that a psychiatric or psychological examination be conducted, and that a report be filed with the court, prior to the date of such hearing.  18 U.S.C. § 4241(b).

Once there is an evaluation, the proceedings are governed by 18 U.S.C. § 4241(d), which provides that if, after a hearing:

> the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General …

Thus, the legal test for competency is two pronged and requires the Court to determine first, if Defendant has "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" and second, whether Defendant has "'a rational as well as factual understanding of the proceedings against him.'"  United States v. Cruz, 805 F.2d 1464, 1479 (11th Cir.1986) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788 (1960)).

In the case at bar, the undersigned finds the preponderance of the evidence indicates Defendant is competent.

1. **Defendant has a rational as well as factual understanding of the proceedings against him**

In his report, Dr. Harris opined that Defendant:

> is not suffering from a mental disease or defect which renders [him] mentally incompetent to the extent of being unable to rationally and factually understand the nature and the consequences of the proceedings or to properly assist in the defense. It is further my opinion the defendant has sufficient ability to consult with counsel with a reasonable degree of rational as well as factual understanding of the proceedings.

(Government Ex. 1, pp. 6-7, 4/29/2013 hearing). Dr. Harris found Defendant was acting more impaired than he actually was. Id. at p. 7. Further, Dr. Harris observed that Defendant "assuredly recognizes the value of presenting himself as psychotic and cognitively impaired, as it has paid off for him on multiple occasions. He has been free to commit crimes with impunity." Id.

The Court believes this opinion is supported by the evidence presented by the Government during the May 29, 2013 hearing. The recordings of Defendant's interview with the ATF agent and his telephone calls demonstrate Defendant has a rational as well as factual understanding of the proceedings. During the telephone conversations, Defendant evinced an understanding of potential outcomes of the proceedings on several occasions in stating he believed he was going to prison. Additionally, on multiple occasions, Defendant speculated that his sentence might be two years in length. Defendant also demonstrated an ability to measure and appreciate lengths of time in stating he had already served five months; in speculating that because he had already served five months, it might mean he would be sentenced to serve only one additional year or less; and by acknowledging a need to budget his money so that he would be able to make phone calls over the period of one year. Defendant also

indicated that he was aware that he was about to undergo a mental evaluation and that

he would likely be sent to a mental facility in North Carolina for three months. Finally,

during the interview with the ATF special agent, Defendant stated he understood his

rights after they were read to him, exhibited an ability to understand the questions

posed to him, and an ability to answer those questions freely.

**2.** **Defendant is able to consult with his lawyer with a reasonable degree of rational understanding**

The recordings also support Dr. Harris's finding that Defendant is able to

communicate with his lawyer with a reasonable degree of rational understanding.  In his

phone calls with friends and relatives, Defendant was able to respond readily to

inquiries about his attorney's name.  Additionally, Defendant made several statements

evincing an appreciation of the distinction between private attorneys and public

defenders.  Defendant was also able to recall advice offered by his attorney during one

of their meetings.  Specifically, Defendant recalled his attorney had advised him to not

make statements that he was going to jail.

Moreover, during the interview with the ATF special agent, Defendant was able

to provide a coherent, detailed story of the events leading up to his arrest.  Defendant

clearly remembered those events and was able to tell the agent the name of the

individual who sold him the gun, how he was able to negotiate the price of the firearm

down to $50 from $80, and that he planned to use the gun to shoot squirrels.

The Court believes these recordings provide support for Dr. Harris's opinion that

Defendant is competent to stand trial.  The recordings show that Defendant can recall

important facts and relay them to others.  Additionally, the recordings show Defendant

understands the proceedings against him, can present a coherent narrative of what

happened to him, and is capable of working with his attorney to present a defense.

Moreover, these recordings support the Court's decision to discount Dr. Valente's

opinion that Defendant is incompetent.  At the time he rendered his decision, Dr.

Valente was not privy to these recordings.  During the May 29, 2013 hearing, Dr.

Valente stated that the recordings carry more weight than the discussions he had with

Defendant because any time Defendant spoke with a doctor, he had an interest in the

outcome.  On the other hand, when he was speaking with his family, Defendant had no

such interest.  Even more persuasive is Dr. Valente's statement that Defendant's

behavior during the interview and the phone calls was consistent with malingering.

The undersigned believes the preponderance of the evidence shows that

Defendant was indeed malingering during his evaluations.  The Court agrees with Dr.

Harris's finding that Defendant does not suffer from a mental disease or defect which

renders him mentally incompetent to the extent of being unable to rationally and

factually understand the nature and consequences of the proceedings or to properly

assist his attorney in the defense.  Accordingly, after due consideration, it is hereby

**ORDERED:**

Defendant, Edgar Moring, is mentally competent to stand trial and there is no

reason to delay further proceedings in this case.

**DONE** and **ORDERED** in Jacksonville, Florida this __5th__ day of June, 2013.

_____
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record